they have been absent for more than three days and provide required medical documentation. Article X also establishes what appears to be a no-fault attendance control policy, utilizing progressive discipline principles to respond to defined levels of employee absenteeism. The contractual policy provides that an employee cannot be discharged for absenteeism without first having received two written warnings.

If the grievant had been discharged solely for excessive absenteeism, the Union's argument would have great weight. After all, once the parties have agreed upon a specific mechanism to address employee absenteeism, it is not likely that the parties agreed to permit the Company's use of an alternative standard.

The grievant, however, was not fired simply for being absent. Instead, his failure to justify the length of that absence, despite his knowledge of Company policy and the Company's specific requests for documentation, are the stated basis of his discharge. Recognizing this distinction, the Union suggests that the medical documentation requirements contained in Article X relate solely to an employee's eligibility for benefits. It thus suggests that while the grievant's actions caused him economic loss, his inaction does not remove the case from Article X's coverage. The Union's argument is creative, but ultimately not persuasive.

Article X's medical documentation requirements appear to relate solely to an employee's eligibility for benefits. That, however, does not make Article X the sole source of the Company's right to seek such documentation. Attendance control is a problem for many employers. Thus, so long as they act reasonably, employers are generally permitted to ask employees to justify consecutive days of absence by providing medical documentation of their illness. Wholly apart from the question of sick leave

benefits, this control assures that extended employee absences are based on real, not fanciful, medical diagnoses. An employer's ability to staff its operations efficiently would be undermined if employees could stay out of work for extended periods, claiming to be ill without, at some point, having to support that claim.

In this instance, Article X defines the "reasonable" period for seeking such documentation as three consecutive days of absenteeism. That does not mean that Article X limits the Company's ability to seek medical documentation solely to determining benefit eligibility. Nor does it make the loss of benefits the exclusive sanction for an employee failing to supply such documentation. More likely than not, Article XVI, the management rights provision, permits the Company to seek medical documentation to determine the bona fides of employee absences and Article X simply precludes the Company from doing so until an employee has been absent three consecutive days. Because, however, an employee's failure to document the bona fides of such an absence implicates a management right arising outside of Article X, that failure provides just cause for discipline under Article VI. Thus, the Union's argument must be rejected and we can now turn to the just cause analysis.

There is, of course, no dispute about the Company's failure to receive any medical documentation supporting the grievant's absence from December 8, 2002 until January 23, 2003. The only dispute is the extent to which the grievant can be held responsible for that failure.

At first blush, there is plausibility to the Union's claim that the grievant cannot be held responsible for the psychiatrist's claimed oversight in failing to write the note the grievant requested on December 21, 2002. The problem is that the grievant's

responsibility as a Company employee entailed more than his getting a note. Instead, under Company policies previously utilized by the grievant, the absence resulting from his medical and psychological treatment also required him to obtain FMLA certification on a Company form from his health care provider and the grievant never supplied any of his providers with that form.

The grievant knew from recent experience that such certification was required. Thus, assuming the grievant never received either of the packages mailed by the Company on December 11, why did he fail to inquire about its absence at any time relevant to this proceeding? After all, the evidence demonstrates that he was keeping in touch with people at the workplace. Given his experience with Company policies, and his then recent experience with its FMLA policies, why did the grievant fail to call and request the form sometime prior to December 21, 2002?

The record is devoid of any good answers to these questions, but their posing makes it clear that his failure to supply medical documentation resulted from more than a simple claimed oversight. Rather, he knew that he was required to obtain an FMLA certificate, not just a conclusory letter, from his health care provider and he made no effort to do so, even after learning of his impending termination. His apparent indifference to these responsibilities undercuts his claim of never having received either Company mailing of December 11, 2002 and, indeed his claim of having requested documentation from his psychiatrist on December 21, 2002.

The Union's suggestion that the psychiatrist's failure to recall such a request may have been a simple oversight is not unworthy of credence. On the other hand, health care professionals know that employer requests for documentation are often critical and that

their failure properly to respond to such requests can place a patient's employment in jeopardy. It thus is not likely that the grievant's psychiatrist would overlook something as critical as a documentation request, especially given his knowledge that the grievant had already been out of work for almost two weeks. Even if the grievant made the request, however, it does not justify his failure to supply the Company with the FMLA certification.

Sadly, the grievant's failure to do so is not surprising. For the grievant, it was his way or the highway. Company rules and expectations were something to be used at his pleasure and not something to be followed on a regular basis. When caught, the grievant would not admit any responsibility and tried to absolve himself of responsibility by placing blame everywhere but where it belonged. Thus, the Company's failure to get the necessary documentation was not his fault. Instead, it was the fault of the Postal Service for not delivering his mail, the fault of his psychiatrist for failing to write a note and the fault of the Company (twice) for once having rejected a psychologist's note and failing to advise him that he failed to do what he was required to do as a Company employee.

At some level, just cause is concerned with personal responsibility. When an employee is not responsible for claimed misconduct because others were or the employee was not on notice about the employer's expectations, the employee is absolved of responsibility and is not subject to discipline. If, however, an employee twists, turns and attempts to evade personal responsibility for violating policies with which the grievant was intimately familiar, just cause for discipline exists.

In this instance, the grievant, not everybody else, was responsible for complying with Company policy and he did not do so. His extensive absence, without such

documentation, was tantamount to abandoning his job during the Company's most critical season. Whether viewed by itself or in conjunction with his work record, the arbitrator must conclude that the grievant's failure provided just cause for his termination. An appropriate Award shall enter.

**AWARD**

The grievant's termination did not violate the Agreement. The grievance is denied.

Marc D. Greenbaum, Arbitrator
Dated: October 27, 2003